HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney (SBN 191992)
KATHLEEN KENEALY, Chief Assistant City Attorney (SBN 212289)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
MOLLY STEPHENS, Deputy City Attorney (SBN 232211)
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California 90012
Telephone:  213-978-1868
Facsimile:   213-978-7011
molly.stephens@lacity.org

Attorneys for Plaintiff City of Los Angeles

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation,<br><br>    Plaintiff,<br><br> vs.<br><br>PULICE CONSTRUCTION, INC., an Arizona corporation,<br><br>    Defendant. | CASE NO.  2:24-cv-8099<br><br>**COMPLAINT FOR:**<br><br>**(1)  STATUTORY DISGORGEMENT BASED ON UNLICENSED WORK**<br><br>**(2)  VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT (PROGRESS PAYMENT REQUESTS)**<br><br>**(3)  VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT (ADDITIONAL PAYMENT DEMANDS)**<br><br>**(4)  REQUESTS FOR DECLARATORY JUDGMENTS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

COMPLAINT

Plaintiff City of Los Angeles (the "City"), by and through its undersigned attorneys, alleges, upon knowledge as to itself and its own actions, and upon information and belief as to all other matters, the following:

## NATURE OF THE ACTION

1.     This action arises out of work performed and payments requested by Pulice Construction, Inc. ("Pulice") as the general contractor on a contract with the City to widen and upgrade the Soto Street Bridge, located about three miles east of downtown Los Angeles and straddling the neighborhoods of Boyle Heights, El Sereno, and Lincoln Heights (the "Project").

2.     Pulice was formed as a family-owned business in Arizona.  At the time of its bid on the Project in March 2018, Pulice had never done work for the City, and unbeknownst to the City, it was going through significant internal turmoil because a foreign conglomerate with billions of euros in annual revenue had acquired it.  All of Pulice's legacy officers and directors had been removed, and the foreign conglomerate had relocated executives from Spain to run the company and grow the business.

3.     Under Pulice's President, who had been in the position for less than 3 years, Pulice bid aggressively for the Project in an attempt to build a relationship with the City.  Among the 10 bidders, Pulice was the second-lowest bidder, estimating that it could complete the Project for approximately $12.6 million.  After the lowest bidder was excluded because it became non-responsive, Pulice became the lowest bidder, which the City was required by law to accept.  Pulice's bid was more than half a million dollars below the average of the remaining 8 bidders, all of which had previously done work for the City, unlike Pulice.  By the end of 2018, the President of Pulice who had supervised the bid was no longer with the company.

4.     The Project was plagued by Pulice's mismanagement and incompetence.  Pulice cycled through a number of key staff, including 3 different project managers, 5 different project engineers, and 6 different superintendents.  Pulice also lost its

COMPLAINT

scheduler less than 2 years into the Project, who it never replaced, preventing it from properly managing its project scheduling, cost reporting, and budget.  In addition, Pulice submitted non-conforming work that had to be corrected.

5.     Nevertheless, the City worked hard to partner with Pulice to finish the Project successfully.  The City provided detailed guidance and comments to Pulice throughout the Project, and issued change orders to compensate Pulice for any changes requested by the City or delays caused by the City, agreeing to increase the contract price to a little over $17.9 million by the time of the last change order executed by the parties in April 2024.

6.     The City has now discovered that Pulice was not entitled to any of this money.  Although Pulice knew that it was prohibited from performing work under the contract without a California contractor's license, it did exactly that.  Pulice performed work under the contract without a valid contractor's license between April 30 and May 20, 2020.  Under California law, if a contractor performs a contract while unlicensed *at any time* during the work, it is not entitled to *any compensation* under the contract. This is a strict liability statute to ensure that contractors operating in California are properly licensed.

7.     Even worse, Pulice hid its unlicensed work from the City.  In each of the 56 progress payment requests that Pulice submitted to the City on and after it became unlicensed, Pulice represented that it completed acceptable work during the time period that it was unlicensed, even though it knew the work was not acceptable because it was performed by an unlicensed contractor.  In addition, in submitting every progress payment request, Pulice impliedly certified that it was entitled to payment because it was in compliance with the parties' contract and governing law, which required it to be licensed at all times while performing work on the contract.  These certifications were false because Pulice, in fact, had performed work while unlicensed.

8.     The City discovered that Pulice performed work while unlicensed—and no longer has any active license in California—after Pulice demanded even more

COMPLAINT

money from the City in a "claim" it submitted to the Bureau of Engineering and an "appeal" it submitted to the Board of Public Works, most recently in April 2024. In those demands for payment, Pulice requested over $4 million more from the City for its work on the Project. As with the 56 false progress payment requests, these two new demands were false. Among other things, Pulice requested compensation for time in excess of the time Pulice actually worked, along with "corporate fees" that Pulice purportedly owes its foreign parent companies, neither of which the City owes Pulice.

9. Enough is enough. The City must protect its taxpayers from unlawful payments and fraudulent payment requests. Pursuant to Business and Professions Code section 7031(b), which authorizes the City to recover all compensation paid to Pulice under the contract if Pulice was unlicensed at any time while preforming work under the contract, the City seeks return of all amounts it has paid to Pulice under the contract, which total $17,438,117.09 as of August 2024. Pursuant to California's False Claims Act, the City seeks recovery for Pulice's false demands for payment, including three times the damages the City suffered by paying Pulice's false progress payment requests, which is $37,243,234.68, civil penalties of not less than $440,000 for all false payment demands, and the costs of this action. The City also seeks declarations that it owes Pulice no more money under the contract for seven different categories of payments that Pulice is still demanding.

## PARTIES

10. Plaintiff City is a municipal corporation established and governed by the City of Los Angeles Charter. The City maintains a Bureau of Engineering that prepared the bid proposal for the Project, selected the general contractor, and oversaw the general contractor's performance of the Project.

11. Defendant Pulice is an Arizona corporation with its principal place of business in Arizona. It is registered to do business in California and was the winning bidder for the Project in the City of Los Angeles. All work that Pulice conducted on

COMPLAINT

the Project was in the City of Los Angeles, and during the Project, Pulice maintained a field office in the City of Los Angeles.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action because there is complete diversity of citizenship between the parties and because the amount in controversy exceeds $75,000.  28 U.S.C. § 1332.  The claim for declaratory judgment is authorized by Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201.

13.     This Court has personal jurisdiction over Pulice pursuant to the Due Process Clause of the United States Constitution because all causes of action arise out of conduct or omissions by Pulice in the City of Los Angeles.

14.     Venue is proper in this Court because the events and omissions giving rise to this Complaint took place in the City of Los Angeles.

## SUBSTANTIVE ALLEGATIONS

A.      **California Law Imposes Stringent Licensing Requirements on Contractors Operating in California**

15.     To protect the public, California has adopted the Contractors State License Law, set forth in Business and Professions Code section 7000 *et seq.*  This law sets forth detailed licensing requirements for contractors operating in California.  To maintain a contractor's license in California, a contractor must designate a Responsible Managing Officer ("RMO") or Responsible Managing Employee ("RME") who works for the contractor and has demonstrated the requisite knowledge and experience to the state licensing board.  Ensuring proper licensure is so important that the Contractors State License Law imposes strict and harsh penalties for a contractor's failure to maintain proper licensure.

16.     For example, section 7028 of the Contractors State License Law makes it a crime for a person to engage in the business of being a contractor in California when the person is not licensed or when the person performs work under a license that is

COMPLAINT

under suspension for failure to pay a civil penalty or to comply with an order of correction (such as an order to designate a qualified RMO or RME).

17.     Section 7031(a) of the Contractors State License Law prohibits a contractor from maintaining any action to recover compensation for the performance of a contract unless the contractor was duly licensed ***at all times*** during the performance of that contract.  Courts have made clear that the statutory language is unambiguous:  "at all times" means what it says.  As the California Supreme Court stated, "[t]he words 'at all times' convey the Legislature's obvious intent to impose a stiff all-or-nothing penalty for unlicensed work by specifying that a contractor is barred from all recovery for [a contract] if unlicensed at any time while performing it."  Courts have therefore denied compensation under multi-year contracts when the contractor was performing work under the contract while unlicensed for only 18 days (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co.*, 36 Cal. 4th 412 (2005)) and approximately 5 weeks (*Bierman v. Hagstrom Const. Co.*, 176 Cal. App. 2d 771 (1959)).

18.     Because a contractor that is unlicensed at any time during the performance of a contract is not entitled to recover compensation for any of the contract, section 7031(b) of the Contractors State License Law allows the counter-party on a contract to recover "all" compensation paid to the contractor under the contract if the contractor performed any part of the contract while unlicensed, regardless of the quality of the work or the reasons that the contractor was not licensed for any period of time.

19.     The purpose of the harsh penalties in the Contractors State License Law is to protect the public from incompetence and dishonesty by contractors that provide building and construction services, and to provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business.  The licensure requirements are so important that courts have

5

COMPLAINT

explicitly recognized that even if they result in unjust enrichment or inequity, they must be enforced.

**B.    Pulice Is an Arizona Company That Was Acquired by a Large Foreign Conglomerate and Suffered Numerous Management Changes**

20.    Pulice was incorporated in Arizona in 1969 as a family-run business. Throughout the 1970s and most of the 1980s, Pulice built subdivisions throughout the Phoenix area.  Starting in the late 1980s, Pulice expanded into new types of construction and new geographic markets, including California, under the leadership of President William R. Pulice, who later became Pulice's Chairman.  For Pulice's contractor's license in California, first issued on April 18, 1988, Mr. Pulice was listed as the RMO.  Pulice's headquarters and much of its work remained in Arizona.

21.    In December 2009, Pulice was acquired by DRAGADOS USA, a subsidiary of the Spanish company DRAGADOS, which is part of the foreign conglomerate ACS Group.  Like DRAGADOS, ACS Group is based in Spain, and the conglomerate's revenues in 2021 were approximately 28 billion euros.  ACS Group created DRAGADOS USA in 2005 to expand into the U.S. market.  DRAGADOS USA grew its U.S. business by acquiring various contracting companies in the U.S. Prior to acquiring Pulice, DRAGADOS USA had acquired two contracting companies in New York in 2007 and 2009.

22.    After Pulice was acquired by DRAGADOS USA, it ceased to be a family-run business.  For example, shortly after the acquisition, all the prior Pulice directors were removed from Pulice's board of directors and replaced by employees of DRAGADOS and ACS Group.  By 2012, all prior officers had been removed and replaced by officers chosen by DRAGADOS and ACS Group.  DRAGADOS even relocated an executive from Spain to Arizona to serve as Pulice's CEO.

23.    By 2014, Mr. Pulice had ceased to be the RMO for Pulice's contractor's license in California and was replaced by an RME, Max Gordon Frazier.  Also by 2014, Pulice had lost its Spanish CEO, who it never replaced.  Pulice instead replaced

COMPLAINT

the President who had been in the position for only approximately 3 years with a new
President, Chris Rogers.  Pulice also brought in Victor Jimenez as Chief Operating
Officer.  Prior to moving to Arizona for Pulice, Mr. Jimenez had worked for
DRAGADOS in Spain for 10 years and had been in the U.S. for a little over two years
working for DRAGADOS USA in New York.

24.     By the end of 2018, Pulice had again lost its President.  Although Mr.
Jimenez is identified on Pulice's annual filings with the Arizona Secretary of State as
Pulice's President starting on March 6, 2019, Mr. Jimenez's LinkedIn profile states
that he did not become Pulice's President until April 2021.

**C.     Without Any Experience Working for the City, Pulice Bid and Won a
Contract With the City**

25.     In or about January 2018, the City issued a Bid Proposal for the Project.
The City Engineer estimated the total cost of the Project at $11,945,664.

26.     The City's Bid Proposal specified that the Project had a completion time
of 750 working days ("WD"), with liquidated damages of $2,400 per calendar day if
the contractor exceeded the completion time.

27.     The City's Bid Proposal also made clear that every bidder had to possess
a valid State of California Contractor's License Classification of "A" at the time of bid.
The Bid Proposal further required a bidder to sign an affidavit, identifying its State of
California contractor's license number and certifying under penalty of perjury that it
had read and understood City Ordinance No. 173677 and the obligations thereunder.
City Ordinance No. 173677 requires City contractors to follow all City, state, and
federal laws, including licensing laws, or risk loss of the contract.

28.     On March 7, 2018, Pulice submitted a bid with a total bid amount of
$12,606,327.65.  Acting on behalf of Pulice, Chris Rogers, as President of Pulice and
using Pulice's California contractor's license, certified under penalty of perjury that he
had read and understood City Ordinance No. 173677 and the obligations thereunder.
As set forth above, Mr. Rogers was no longer with Pulice by the end of 2018.

7

29.    Pulice's March 2018 bid for the Project was the first bid that Pulice had ever submitted for a project with the City.  Nine other companies also submitted bids, and Pulice was the second-lowest bidder.  After the lowest bidder was excluded because it became non-responsive, Pulice became the lowest bidder.  Pulice's bid was approximately $593,000 below the average of the remaining 8 bidders, all of which had previously done work for the City, unlike Pulice.

30.    Because the City is obligated by law to accept the bid of the lowest responsive and responsible bidder, it selected Pulice as the general contractor on the Project.  The City was unaware of the internal turmoil within the company.

**D.    The Governing Contract Required Pulice To Be Licensed in the State of California at All Times, Consistent with California Law**

31.    The Project was governed not only by the Bid Proposal, City Ordinance No. 173677, and California licensing laws, but also by a set of General Conditions and General Requirements (collectively, the "Contract").  The General Conditions and General Requirements are attached hereto as Exhibit A.

32.    The Contract has multiple provisions reflecting the requirement that Pulice be duly licensed with the State of California throughout the Project.  For example, being a licensed contractor is a requirement incorporated into the very definition of "Contractor," a term used throughout the Contract.  "Contractor" is defined to mean "[a] person or persons, partnership, firm or corporation licensed by the State of California as a general contractor."  Gen. Conds. § 00100.  Thus, every provision of the Contract referring to the Contractor presumes that the Contractor is properly licensed by the State of California.

33.    In addition, the Contract includes a representation in Section 00315 of the General Conditions, in which the Contractor agrees that "it is fully experienced and properly qualified to perform the class of Work required for the Contract and that it is properly licensed, equipped, organized and financed to perform the Work."

34.    Under the Contract, Pulice was required to submit progress payment

8

COMPLAINT

requests to the City to receive progress payments, generally on a monthly basis.  When submitting progress payment requests, the Contract required Pulice to state "an estimate of the cumulative amount and value of *acceptable Work* performed."  Gen. Reqs. § 01292, ¶ 1.3(B)(1) (emphasis added).

### E. Pulice Accepted the Project and Planned to Complete the Work in the Original 750 WD Specified for the Project

35.    After selecting Pulice as the contractor on the Project, the City issued a Notice to Proceed to Pulice on September 10, 2018.  As with the City's Bid Proposal, the Notice to Proceed specified that the Project be completed in 750 WD.  In the Notice to Proceed, the City substituted Pulice's bid amount of $12,606,327.65 for the Contract price.

36.    Pulice accepted the Notice to Proceed without any revisions and proceeded with the Project.  As required by the Contract, Pulice prepared a Baseline Schedule, dated October 6, 2018, showing the tasks that would be completed throughout the Project and each task's start and end dates.  As in the City's Bid Proposal and the Notice to Proceed, Pulice represented a job timeline of 750 WD. Given that the Notice to Proceed was issued on September 10, 2018, Pulice identified a job completion date of September 16, 2021, or 750 WD from September 10, 2018.

37.    Pulice did not represent that it could complete the Project in less than 750 WD, but if it had done so, the Contract provided that the City had the option, but not the obligation, to accept the shorter timeline and issue a change order accelerating the Contract Completion Date.  Gen. Reqs. § 01321, ¶ 1(E)(4).  Such a change order was optional because it might not be feasible for the City to accelerate the Contract Completion Date for a number of reasons, such as the lack of availability of engineering staff to supervise the Project.  In any event, Pulice did not request advancement of the original Contract Completion Date, and it remained 750 WD as Pulice started work.

38.    As provided in the Contract, without any agreement by the City to

COMPLAINT

advance the Contract Completion Date, any plan by Pulice to finish the Project early could not benefit Pulice.  Instead, the Contract explicitly states that the difference between an early completion date and the Contract Completion Date is considered "project float," which could not be used by Pulice to recover time extensions or delay damages.  Gen. Reqs. § 01321, ¶¶ 1(E)(4), (N).

39.    The first change order that changed the Contract Completion Date was executed by the City and Pulice on June 13, 2019.  That change order extended the Contract Completion Date by 13 WD for unusually severe weather, making September 30, 2021 the Contract Completion Date, which was 763 WD (750 WD + 13 WD) from the Notice to Proceed date.  By signing the change order, Pulice agreed to the time set forth in the change order.  Subsequent change orders providing additional extensions to the Contract Completion Date all specified that the original Contract Completion was 750 WD.  Pulice agreed with all of these change orders.

**F.    Pulice Ceased to Be a Duly Licensed Contractor During Its Performance of the Contract**

40.    As the work proceeded, the City supervised the Project.  Unbeknownst to the City, however, Pulice ceased to be a duly licensed contractor with the State of California between April 30 and May 20, 2020.  Specifically, Pulice's license expired on April 30, 2020, and it was not renewed until May 20, 2020.

41.    Pulice continued to perform work under the Contract while it was unlicensed.  For example, Pulice submitted photographs to the City showing work being performed on April 30, May 1, May 4 through 6, May 8, May 11 through 14, and May 18 through 20, 2020.  Pulice also submitted daily work reports, dated April 30 and May 1, 4, 5, 7, 8, 11, 13, 14, 15, 18, 19, and 20, 2020, describing the construction tasks Pulice performed and the labor and materials it used.  Finally, Pulice submitted Progress Payment Request No. 19 on April 30, 2020, requesting payment for work it performed from April 2 to May 1, 2020, and submitted Progress Payment Request No. 20 on June 5, 2020, requesting payment for work it performed from May

10

2 to June 1, 2020.

42.     In letting its California contractor's license expire during the Project, Pulice did not act reasonably and in good faith.  Among other things, Pulice had been licensed with the State of California since April 18, 1988.  Pursuant to Business and Professions Code section 7140, most recently amended in 1991, Pulice knew that its California contractor's license expired every 2 years on the last day of the month in which the license was issued, or April 30.  Having known of this requirement for almost 30 years as of April 2020, there is no reasonable, good-faith reason for Pulice to have missed the requirement.  That is especially true because Pulice knew it was actively working on the Project with the City worth tens of millions of dollars for which it was required to have a valid California contractor's license to perform any work.

**G.     Pulice Never Informed the City That It Performed Unlicensed Work and Submitted False Progress Payment Requests Month After Month**

43.     Although Pulice was well aware that it performed work on the Contract while it was unlicensed, it failed to inform the City.

44.     Instead, as required by the Contract, Pulice submitted progress payment requests to the City month after month, in which it represented the value of the previously completed acceptable work under the Project, along with the value of the acceptable work completed for that pay period.

45.     Specifically, Pulice submitted Progress Payment Request No. 19 on April 30, 2020, representing the value of the acceptable work completed for the period from April 2 to May 1, 2020 as $237,354.10, and submitted Progress Payment Request No. 20 on June 5, 2022, representing the value of the acceptable work completed for the period from May 2 to June 1, 2020 as $209,417.23.  Each of these representations about the value of the acceptable work completed for the period was false because the amount included unlicensed work, which was not acceptable.  In addition, in Progress Payment Request No. 20, Pulice represented that the value of the previously completed

11

acceptable work under the Project was $5,548,127.90. This amount was also false because it included unlicensed work for the prior period, which was not acceptable. In reliance on Pulice's false representations, the City paid Pulice $279,400.30 for Progress Payment Request No. 19 (which was higher than the initial request because Pulice added a change order to the payment request during the invoice review process with the City) and $199,698.06 for Progress Payment Request No. 20.

46.    Moreover, all subsequent progress payment requests submitted by Pulice after Progress Payment Request No. 20 were false because Pulice included the value of unlicensed work from April 30 to May 20, 2020 in its representations about the value of the previously completed acceptable work, even though the unlicensed work was not acceptable work. Each of these false payment requests, along with the date that Pulice submitted the request and the amount that the City paid in reliance on the request, is listed below:

| Progress Payment Request No. | Date Pulice Submitted Payment Request | Amount Paid by City to Pulice for Payment Request |
|---|---|---|
| 21 | 07/06/2020 | $280,659.39 |
| 22 | 07/28/2020 | $89,277.89 |
| 23 | 09/02/2020 | $365,682.44 |
| 24 | 10/13/2020 | $495,810.91 |
| 25 | 11/04/2020 | $784,140.70 |
| 26 | 11/30/2020 | $158,109.01 |
| 27 | 12/30/2020 | $106,286.03 |
| 28 | 01/27/2021 | $143,249.96 |
| 29 | 02/26/2021 | $35,559.77 |

COMPLAINT

| Progress Payment Request No. | Date Pulice Submitted Payment Request | Amount Paid by City to Pulice for Payment Request |
|---|---|---|
| 30 | 04/06/2021 | $33,694.75 |
| 31 | 04/27/2021 | $635,095.12 |
| 32 | 06/03/2021 | $549,355.92 |
| 33 | 07/08/2021 | $519,265.41 |
| 34 | 07/29/2021 | $554,148.52 |
| 35 | 09/03/2021 | $841,019.21 |
| 36 | 10/06/2021 | $267,613.12 |
| 37 | 11/01/2021 | $326,533.47 |
| 38 | 12/07/2021 | $184,535.07 |
| 39 | 12/23/2021 | $258,964.77 |
| 40 | 01/24/2022 | $25,998.88 |
| 41 | 03/01/2022 | $266,940.39 |
| 42 | 04/04/2022 | $150,803.64 |
| 43 | 05/13/2022 | $228,028.88 |
| 44 | 06/08/2022 | $420,901.33 |
| 45 | 07/19/2022 | $333,378.09 |
| 46 | 09/01/2022 | $112,750.86 |
| 47 | 09/26/2022 | $57,677.83 |
| 48 | 10/29/2022 | $43,654.49 |
| 49 | 11/16/2022 | $436,212.25 |

COMPLAINT

| Progress Payment Request No. | Date Pulice Submitted Payment Request | Amount Paid by City to Pulice for Payment Request |
|---|---|---|
| 50 | 01/11/2023 | $604,497.93 |
| 51 | 02/02/2023 | $96,861.33 |
| 52 | 03/21/2023 | $62,361.51 |
| 53 | 11/17/2023 | $560,408.35 |
| 54 | 12/15/2023 | $1,246,182.00 |
| 55 | 03/01/2024 | $207,289.10 |
| 56 | 04/19/2024 | $452,364.88 |

47.     In addition to including false representations about the value of the acceptable work, Progress Payment Request Nos. 19 through 56 were false for a separate reason.  In submitting each progress payment request, Pulice impliedly certified that it was in compliance with the Contract, City ordinances, and state law and therefore entitled to payment.  Each certification was false because Pulice, in fact, was not in compliance with the Contract, City ordinances, and state law and was not entitled to payment.  By performing work while unlicensed, Pulice breached the Contract, including Section 00315 of the General Conditions, City Ordinance No. 173677, and the Contractors State License Law, and it was not entitled to any payments under the Contract.

48.     Had the City known that Pulice performed work while unlicensed, the City would have withheld payments and investigated its rights and obligations to terminate the Contract.  The City cannot have unlicensed contractors working on its projects.

**H.    Because of Its Mismanagement and Incompetence, Pulice Had Substantial Cost Overruns**

49.    Pulice's failure to maintain its contractor's license during performance of the Contract was indicative of Pulice's mismanagement and incompetence during the Project.

50.    As occurred prior to Pulice bidding on the Project, Pulice continued to suffer extensive turnover in management and staff during the Project.  As set forth above, Pulice received the Notice to Proceed on September 10, 2018.  By May 2019, Pulice had lost both its project engineers.  Pulice was able to replace only one of the project engineers.  Although Pulice tried to replace the other project engineer, its first replacement lasted only one year (from April 2020 to April 2021), and its second replacement lasted less than one year (from April 2021 to March 2022).  By April 2020, Pulice had also lost its scheduler, who it never replaced.  By March 2021, Pulice had lost is administrator, who it never replaced.  Pulice also cycled through 3 different project managers and 6 different superintendents throughout the Project.

51.    The constant turnover resulted in Pulice failing to manage its project scheduling, cost reporting, and budget.  For example, Pulice failed to follow basic project management techniques, such as updating its budget when change orders were issued or tracking quantities of labor and materials used to make sure it did not go overbudget.

52.    Although the City was unaware of what was going on behind the scenes at Pulice, the City observed repeated mistakes on the part of Pulice that created delays and increased costs.  For example:

a.    Pulice failed to plan for a USC overhead fiber optic line it identified in November 2018, and developed an installation plan for cast-in-steel-shell concrete piles that directly conflicted with the overhead line.  Pulice did not realize the conflict until the crane that interfered with the line was in place.

b.    Pulice failed to plan properly for the demolition of the east bridge

15

COMPLAINT

barrier.  Pulice submitted at least 10 different demolition plans that did not comply
with the Contract, including because Pulice omitted necessary calculations,
engineering stamps, or details of its means and methods.  Although Pulice was aware
of the demolition requirements since at least June 18, 2019, its mistakes caused a plan
not to be approved until almost two years later—on July 1, 2022.

c.     It took Pulice 7 months just to construct a single light pole.
Although the City requested the light pole on August 9, 2022, it took Pulice until
November 3, 2022 to submit conforming shop drawings.  After the drawings were
approved the next day, it then took Pulice until March 10, 2023 to procure the light
pole.

d.     During the Project, Police constructed multiple non-conforming
items that it had to correct.  The City issued notices of non-compliance for, among
other things, a retaining wall that was not in compliance for at least 3.5 months, a
barrier rail and sidewalk that were not in compliance for 4 months, and a bridge barrier
wall and sidewalk that were not in compliance for 4 months.

e.     Towards the end of the Project, the City's inspections revealed
dozens of additional items that Pulice had to correct.  Specifically, the Project
Inspector provided a preliminary punchlist to Pulice in November 2022 with 49 items
that Pulice needed to complete before final inspection.  The final inspection in April
2023 resulted in 28 corrections for Pulice to complete.

53.     As a result of its mismanagement and mistakes, Pulice spent 39,000 labor
hours on the Project when it initially planned on 22,000 hours.  Pulice also incurred
accounting losses on the Project of approximately $4 million.

**I.     After Completing Its Construction Work, Pulice Continued to Sign
Change Orders and Submit Progress Payment Requests Under the
Contract**

54.     After Pulice corrected the 28 items identified in the City's final
inspection, the City issued a Statement of Completion to Pulice identifying a final field

COMPLAINT

acceptance date of June 1, 2023. The contract did not end on that date, however.

55.     Instead, after June 1, 2023, Pulice signed additional change orders and submitted progress payment requests under the Contract in an effort to obtain increased compensation. For example, Pulice executed 21 change orders with the City from June 14, 2023 to April 12, 2024. These change orders resulted in payment increases to Pulice of a little over $2 million and time extensions to Pulice of 197 WD.

56.     Pulice also submitted four progress payment requests to the City after June 1, 2023 (Nos. 53 through 56). The last progress payment request (No. 56) was submitted by Pulice on April 19, 2024.

57.     Section 00601 of the General Conditions in the Contract provides that "[a]ny applicable statute of limitations shall commence to run . . . in any and all events no later than 30 days after Contractor's submittal of its last application for progress payment of Contract or Change Order Work satisfactorily performed."

58.     In July 2024, the City made a payment to Pulice of $452,364.88 in response to Pulice's final progress payment request (No. 56). Based on Pulice's prior progress payment requests and executed change orders, the Contract price had increased to $17,926,350.81. This was approximately $5.32 million higher than the amount that Pulice bid for the Project in March 2018.

59.     In making the July 2024 payment, the City's total payments did not equal the full Contract price of $17,926,350.81 because it withheld $488,233.72 as "disputed funds." The "disputed funds" refers to potential penalties that Pulice may owe if subcontractors listed on Pulice's bid and identified as "OBE" (Other Business Enterprise) for the City's Business Inclusion Program did not receive at least the amount indicated on the bid from Pulice. Because Pulice (not the City) paid the subcontractors, the City is required to contact each OBE subcontractor to verify the funds that it received from Pulice. The City is still verifying final dollar amounts, and it recently received notice that Pulice's Business Tax Registration Certificate, which is required for conducting business with the City and receiving payments from the City,

17

has expired.

**J.    Pulice Sought to Shift Its Losses to the City, Including by Submitting Additional False Demands for Payment**

60.    Although the City agreed to increase the payments to Pulice under the contract by approximately $5.32 million, resulting in more than a 40% increase in the contract price, Pulice still wanted more money.

61.    On February 16, 2024, Pulice submitted a claim to the City's Bureau of Engineering demanding over $4 million in additional payments, which comprised (a) payments associated with additional time extensions that exceed the actual time it took for Pulice to complete the Project, which the City has calculated as totaling approximately $1,738,000; (b) 6.9% of any amounts the City pays to Pulice, purportedly to cover a "corporate fee" that Pulice owes its foreign corporate parent companies, totaling $366,683; (c) a 15% markup on approved and unapproved field office overhead, totaling $315,275; (d) "inefficiency costs" of $2,828,232; (e) $68,907 in "other costs" associated with Pulice's voluntary demobilization from the jobsite from February 12 through April 5, 2021; (f) a 1% bond fee on all unapproved costs, including unapproved field office overhead, totaling $32,197; and (g) an unspecified amount of interest on all additional amounts that Pulice has demanded from the City, running from the day Pulice was damaged, pursuant to California Civil Code section 3287.

62.    After the Bureau of Engineering denied the bulk of Pulice's claim, Pulice submitted a substantially similar appeal to the City's Board of Public Works, dated April 3, 2024, demanding payment.  The new demand requested (a) payments associated with additional time extensions that exceed the actual time it took for Pulice to complete the Project, which the City has calculated as totaling approximately $1,738,000; (b) 6.9% of any amounts the City pays to Pulice, purportedly to cover a "corporate fee" that Pulice owes its foreign corporate parent companies, totaling $366,286; (c) a 15% markup on approved and unapproved field office overhead,

totaling $315,275; (d) "inefficiency costs" of $2,828,232; (e) $63,149 in "other costs" associated with Pulice's voluntary demobilization from the jobsite from February 12 through April 5, 2021; (f) a 1% bond fee on all unapproved costs, including unapproved field office overhead, totaling $32,197; and (g) an unspecified amount of interest on all additional amounts that Pulice has demanded from the City, running from the day Pulice was damaged, pursuant to California Civil Code section 3287

63.    These demands for payment were false, including because:

a.    Pulice frivolously requested 192 WD in additional time extensions that exceed the total amount of time that Pulice spent on the Project.  Because Pulice cannot recover for more time that it actually worked, it stated in its payment demands that it intended to complete the Project 28 months earlier than the original Contract Completion Date of 750 WD from the Notice to Proceed and that it can recover time extensions for the difference between its earlier planned completion date and the original Contract Completion Date.  These statements were false.  As set forth above, Pulice repeatedly agreed that the original Contract Completion Date was 750 WD from the Notice to Proceed, or September 16, 2021.  Moreover, Pulice knew that the original Contract Completion Date was never changed via a change order.  Section 01321 of the General Requirements of the Contract is explicit that the Contract Completion Date governs, and any difference between an earlier completion date and the Contract Completion Date constituted project float that could not be used by Pulice to obtain time extensions or compensation.

b.    Pulice knew it had no right to demand that the City pay a 6.9% markup on all amounts received from the City to cover the "corporate fees" it purportedly must send to its foreign parent companies.  The Contract governs the City's obligations to make payments to Pulice for work on the Project, and as Pulice admitted in its payment demands, the Contract "is silent with respect to reimbursement of corporate fees."  Pulice is fabricating out of whole cloth a payment obligation for the City and its taxpayers that does not exist.

19

COMPLAINT

**K.     The City Discovered Pulice Is No Longer Licensed and Was Not Licensed While Performing Work Under the Contract**

64.     Because the City denied the bulk of Pulice's additional payment demands for over $4 million, Pulice requested that the City participate in mediation, in accordance with Public Contract Code section 9204.

65.     As part of its due diligence in preparation for mediation, the City checked Pulice's current licensing status in California in July 2024, and discovered that Pulice's California contractor's license is currently inactive, meaning that Pulice is ineligible to conduct contracting business in California.  This information raised questions about when Pulice's license became inactive, especially because it was submitting progress payment requests to the City as recently as April 2024.  The City therefore placed an order with the Contractors State License Board for Pulice's certified license history from August 24, 2018 to the present.  The license history is only available from the Contractors State License Board upon written request and payment of a $67 fee.

66.     On August 8, 2024, the City received Pulice's certified licensing history from the Contractors State License Board.  For the first time, the City discovered that Pulice was not licensed while performing work under the Contract from April 30 to May 20, 2020.  The City also discovered for the first time that Pulice lost its RME (Max Gordon Frazier) on December 31, 2023.  Although Pulice was required by California law to replace its RME to maintain its California contractor's license, Pulice failed to do so.  Pulice's contractor's license was suspended on March 30, 2024.  Over one month later, on May 1, 2024, Pulice made its contractor's license inactive, which resolved the suspension.  With an inactive license, it is a crime for Pulice to engage in the business of a contractor in California.

67.     The parties participated in mediation on August 20, 2024, which was unsuccessful.  Pulice has stated unequivocally that it intends to pursue litigation against the City for its additional payment demands.

**FIRST CAUSE OF ACTION**

**(Statutory Disgorgement Pursuant to Cal. Bus. & Prof. Code § 7031(b))**

68.    The City re-alleges and incorporates by reference Paragraphs 1 through 67 above as if fully set forth herein.

69.    Pursuant to Business and Professions Code section 7031(b), the City is entitled to recover all compensation paid to Pulice under the Contract if Pulice was not duly licensed as a contractor with the State of California at any time during its performance of the Contract.

70.    From approximately April 30 to May 20, 2020, Pulice was not duly licensed as a contractor with the State of California while it was performing services under the Contract.

71.    As of August 2024, the City has paid Pulice a total of $17,438,117.09 under the Contract.

72.    Pursuant to Business and Professions Code section 7031(b), the City seeks to recover the full amount it has paid to Pulice under the Contract.

73.    This claim is timely because the City is bringing the claim within one year after the claim accrued and the statute of limitations began to run.  Among other things, pursuant to Section 00601 of the General Conditions in the Contract, the claim accrued and the statute of limitations began to run on May 19, 2024, which was 30 days after Pulice's submittal on April 19, 2024 of its last progress payment request under the Contract.  In addition, the City is still finalizing payments under the Contract.

**SECOND CAUSE OF ACTION**

**(Violations of the California False Claims Act for Pulice's Progress Payment Requests)**

74.    The City re-alleges and incorporates by reference Paragraphs 1 through 73 above as if fully set forth herein.

75.    As detailed above, between April 30, 2020 and April 19, 2024, Pulice

21

COMPLAINT

submitted progress payment requests to the City under the Contract, referred to as Progress Payment Request Nos. 19 through 56.

76. Each of these progress payment requests was false, including because:

a. Each request included explicit representations by Pulice about the value of the acceptable work completed for the pay period and the value of the previously completed acceptable work under the Project. In the April 30, 2020 payment request (Progress Payment Request No. 19), Pulice's representation about the value of the acceptable work completed for the pay period was false because it included unlicensed work for that period, which was not acceptable work. In the June 5, 2020 payment request (Progress Payment Request No. 20), Pulice's representations about the value of the acceptable completed for the pay period and the value of the previously completed acceptable work under the Project were false because they included unlicensed work, which was not acceptable work. And in the remaining payment requests from July 6, 2020 to April 19, 2024 (Progress Payment Request Nos. 21 through 56), Pulice's representation about the value of the previously completed acceptable work under the Project was false because it included unlicensed work, which was not acceptable work.

b. In submitting each progress payment request, Pulice impliedly certified that it was in compliance with the Contract, City ordinances, and state law and entitled to payment. Each certification was false because, by performing unlicensed work under the Contract, Pulice was in breach of the Contract, City ordinances, and state law, and was not entitled to payment.

77. Based on the facts set forth above, Pulice knew, deliberately ignored, or was reckless in not knowing that its representations and certifications were false.

78. Pulice's representations and certifications were material in that they had a natural tendency to influence, or be capable of influencing, the City's payment of money. Among other things, had the City known that Pulice performed work while unlicensed, the City would have withheld payments and investigated its rights and

COMPLAINT

obligations to terminate the Contract.

79.    The City paid Pulice a total of $12,414,411.56 for Payment Request Nos. 19 through 56.

80.    The City was damaged in the amount it paid Pulice for the false progress payment requests, and under California's False Claims Act, the City is entitled to recover treble damages, or $37,243,234.68.

81.    In addition, under California's False Claims Act, the City is entitled to recover the costs of this action and a civil penalty of not less than $5,500 and not more than $11,000 for each violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.  The City requests a civil penalty of not less than $11,000 for each of the 38 false progress payment requests, totaling $418,000.

### THIRD CAUSE OF ACTION

**(Violations of the California False Claims Act for Pulice's Demands for Additional Payments)**

82.    The City re-alleges and incorporates by reference Paragraphs 1 through 81 above as if fully set forth herein.

83.    As detailed above, Pulice submitted two substantially identical demands for additional payments to the City's Bureau of Engineering and Board of Public Works on February 16 and April 3, 2024.

84.    These additional payment demands were false, including because:

a.    Pulice stated that it was entitled to recover time extensions that exceeded the actual time spent on the Project, calculated as the difference between Pulice's earlier planned completion date and the original Contract Completion Date. These statements were false because they were contrary to Pulice's own statements that it would not complete the Project early, the parties' agreement that the original Contract Completion Date was 750 WD from the Notice to Proceed, and the Contract provision that the difference between any earlier completion date and the Contract Completion Date is project float that cannot be used for time extensions.

23

COMPLAINT

   b.    Pulice stated that the City is obligated to pay a 6.9% markup on all amounts to cover the "corporate fees" that Pulice purportedly must send foreign parent companies, but Pulice has recognized that there is no such payment obligation under the Contract.

85.    Based on the facts set forth above, Pulice knew, deliberately ignored, or was reckless in not knowing that its statements were false.

86.    Pulice's statements were material in that they had a natural tendency to influence, or be capable of influencing, the City's payment of money.  Among other things, absent Pulice's statements in support of the specific payment requests, the City would not have had to investigate the requests.

87.    The City was damaged by the false statements in an amount to be proven at trial, including the employee and expert hours that the City has paid and continues to pay in responding to these false statements.  Under California's False Claims Act, the City is entitled to recover treble damages.

88.    In addition, under California's False Claims Act, the City is entitled to recover the costs of this action and a civil penalty of not less than $5,500 and not more than $11,000 for each violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.  The City requests a civil penalty of not less than $11,000 for each of the 2 false payments, totaling $22,000.

## FOURTH CAUSE OF ACTION

### (Request for Declaratory Judgments)

89.    The City re-alleges and incorporates by reference Paragraphs 1 through 88 above as if fully set forth herein.

90.    Actual controversies have arisen and now exist between the City and Pulice concerning the City's obligations under the Contract to make seven different categories of additional payments to Pulice.  The City seeks a separate declaration as to each of these seven categories of payments, as follows:

24

Category 1:  Time Extensions That Exceed the Actual Project Time

91.    As set forth above, Pulice demands that the City pay costs associated with additional time extensions that exceed the actual time it took for Pulice to complete the Project, which the City has calculated as totaling approximately $1,738,000.

92.    The City does not owe Pulice any money for these additional time extensions for multiple reasons, including that (a) pursuant to Business and Professions Code section 7031, Pulice is not entitled to any payments under the Contract because it performed work under the Contract while unlicensed; (b) pursuant to Sections 01254 and 01321 of the General Requirements in the Contract, Pulice is not entitled to time extensions that did not exceed Pulice's actual work or the Contract Completion Date; and (c) any intent by Pulice to finish early was not documented in a change order signed by the City changing the Contract Completion Date, and pursuant to Sections 01254 and 01321 of the General Requirements in the Contract, any difference between an early completion date and the Contract Completion Date could be used only for project float that did not entitle Pulice to recovery of time extensions.

93.    Accordingly, the City seeks a declaration that it does not owe Pulice any money for the additional time extensions.

Category 2:  Corporate Fee of 6.9%

94.    As set forth above, Pulice demands that the City pay $366,286 for a 6.9% corporate fee that Pulice purportedly owes its foreign corporate parent companies.

95.    The City does not owe Pulice any money for this corporate fee, including because (a) pursuant to Business and Professions Code section 7031, Pulice is not entitled to any payments under the Contract because it performed work under the Contract while unlicensed; (b) as Pulice admits, the Contract, which governs the rights and obligations of the parties, does not provide for the payment of corporate fees; and (c) the Contract defines the percentage markups that are permitted in Section 01254 of the General Requirements and does not include this markup.

96.    Accordingly, the City seeks a declaration that it does not owe Pulice any

money for corporate fees.

Category 3:  15% Markup on Field Office Overhead

97.    As set forth above, Pulice demands that the City pay a 15% markup on approved and unapproved field office overhead, totaling $315,275.

98.    The City does not owe Pulice any markup on field office overhead, including because (a) pursuant to Business and Professions Code section 7031, Pulice is not entitled to any payments under the Contract because it performed work under the Contract while unlicensed; (b) Section 01254 of the General Requirements in the Contract explicitly does not permit any markup on field office overhead.

99.    Accordingly, the City seeks a declaration that it does not owe Pulice any markup on field office overhead.

Category 4:  Inefficiency Costs

100.    As set forth above, Pulice demands that the City pay inefficiency costs of $2,828,232.

101.    The City does not owe Pulice these inefficiency costs, including because (a) pursuant to Business and Professions Code section 7031, Pulice is not entitled to any payments under the Contract because it performed work under the Contract while unlicensed; (b) Pulice's inefficiency cost calculations do not satisfy the Contract requirements, including in Section 01254 of the General Requirements that prohibit recoveries based on probabilities and inferences; (c) Pulice's requests for inefficiency costs were untimely under the Contract, including in Section 00400 of the General Conditions and Sections 01251 and 01254 of the General Requirements, which bars recovery; and (d) Pulice's methodology for calculating inefficiency costs is not targeted to inefficiencies caused by the City.

102.    Accordingly, the City seeks a declaration that it does not owe Pulice any of the inefficiency costs.

Category 5:  Other Costs Associated With Pulice's Voluntary Demobilization

103.    As set forth above, Pulice demands that the City pay $63,149 in other

26

COMPLAINT

costs associated with Pulice's voluntary demobilization from the jobsite from February 12 through April 5, 2021.

104. The City does not owe Pulice these others costs, including because (a) pursuant to Business and Professions Code section 7031, Pulice is not entitled to any payments under the Contract because it performed work under the Contract while unlicensed; (b) the costs are not time-related costs associated with the demobilization and are therefore not recoverable pursuant to Section 00400 of the General Conditions and Section 01254 of the General Requirements of the Contract; and (c) Pulice failed to submit the written evidence supporting its cost request within the contractually required time period, thereby waiving its claim under Section 00400 of the General Conditions of the Contract.

105. Accordingly, the City seeks a declaration that it does not owe Pulice any other costs associated with Pulice's voluntary demobilization of work from February 12 through April 5, 2021.

Category 6:  1% Bond Fee

106. As set forth above, Pulice demands that the City pay a 1% bond fee on all unapproved costs, included unapproved field office overhead, totaling $32,197.

107. The City does not owe Pulice the 1% bond fee, including because (a) pursuant to Business and Professions Code section 7031, Pulice is not entitled to any payments under the Contract because it performed work under the Contract while unlicensed; (b) Section 01254 of the General Requirements of the Contract provides that the 1% markup is allowed only on "direct costs (less markup)," and none of the unapproved costs that Pulice seeks constitute direct costs; and (c) Pulice is not entitled to any of the unapproved costs.

108. Accordingly, the City seeks a declaration that it does not owe Pulice a 1% bond fee on any of the unapproved costs.

Category 7:  Interest

109. As set forth above, Pulice demands that the City pay interest on all

COMPLAINT

amounts it recovers from the City, running from the day Pulice was damaged, pursuant to California Civil Code section 3287.

110.   The City does not owe Pulice any interest, including because (a) pursuant to Business and Professions Code section 7031, Pulice is not entitled to any payments under the Contract because it performed work under the Contract while unlicensed; and (b) the amounts that Pulice demands are not "certain, or capable of being made certain by calculation," as required by Civil Code section 3287, because there is a dispute about the basis of computation for all categories of payment requests.

111.   Accordingly, the City seeks a declaration that it does not owe Pulice interest on any amounts recovered from the City running from the day Pulice was damaged pursuant to California Civil Code section 3287.


## **PRAYER FOR RELIEF**

WHEREFORE, the City prays for judgment against Pulice as follows:

1.    For disgorgement of all amounts paid to Pulice under the Contract, which was $17,438,117.09 as of August 2024;

2.    For compensatory and treble damages in an amount to be determined at trial, but not less than $37,243,234.68.

3.    For civil penalties to be determined at trial, but not less than $440,000.

4.    For the following declarations:

    a.    The City does not owe Pulice any money for additional time extensions.

    b.    The does not owe Pulice any money for corporate fees.

    c.    The City does not owe Pulice any markup on field office overhead.

    d.    The City does not owe Pulice any money for inefficiency costs.

COMPLAINT

e.     The City does not owe Pulice any other costs associated with Pulice's voluntary demobilization from the jobsite from February 12 through April 5, 2021.

f.     The City does not owe Pulice a 1% bond fee on any of the unapproved costs.

g.     The City does not owe Pulice interest on any amounts recovered from the City running from the day Pulice was damaged pursuant to California Civil Code section 3287.

5.     For attorneys' fees and costs as authorized by law;

6.     For prejudgment and post judgment interest; and

7.     For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the City hereby demands a trial by jury of all issues triable of right by a jury.

Dated:  September 20, 2024          HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney
KATHLEEN KENEALY, Chief Assistant City Attorney
GABRIEL S. DERMER, Assistant City Attorney
MOLLY STEPHENS, Deputy City Attorney

By:  */s/ Molly Stephens*
MOLLY STEPHENS
Deputy City Attorney
*Attorneys for City of Los Angeles*

29

COMPLAINT